**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald Jakemer, et al., | ) No. CV-06-2583-PHX-SMM |
| Plaintiffs, | ) **MEMORANDUM OF DECISION AND ORDER** |
| v. | ) |
| Aaron A. Romano, et al., | ) |
| Defendants. | ) |

Pending before the Court are Defendants' Request for Judicial Notice (Dkt. 6) and Motion to Dismiss (Dkt. 7).

**BACKGROUND**

i. Factual History

Plaintiffs Kathleen and Ronald Jakemer ("the Jakemers") and Gordon and Marjorie O'Brien ("the O'Briens"), are retirees residing in Arizona and Massachusetts respectively. (Compl. ¶¶ 1,2). Defendants Aaron Romano ("Romano"), Randall Carson ("Carson") and Jon Turner ("Turner") are officers of the North American Deed Company, Inc. ("NAD").[1] (Compl. ¶¶ 3-5). Defendants are alleged to have managed or controlled several other entities operating out of the same office as NAD, including Romano & Carson, Inc., Blue Vault, Inc., TitleRight, Inc., Notaries on Wheels, Inc., and Caribbean Beach, Inc. (Compl. ¶ 9)

---

[1]Each Defendant is being sued both individually and on behalf of his marital community.

Between April 28, 2000 and September 2, 2002, the O'Briens made a series of investments through Romano, totaling $301,500.75. (Compl. ¶ 12).  The O'Briens believed that these funds were being invested in "corporate bonds" yielding a minimum return of 12% per year. (Compl. ¶ 13).  On July 23, 2002, the Jakemers- working with Romano-- invested $64,375 into a "Straight Note" issued by NAD, which was to be paid in one payment in the amount of $80,752.05 on July 22, 2004. (Compl. ¶ 15).

In 2004, Romano presented Plaintiffs with Conversion and Release Agreements ("Conversion Agreements"), which were signed by Carson. (Compl. ¶ 17).  The Conversion Agreements had the effect of converting Plaintiffs' debt securities into equity securities in NAD and Blue Vault, Inc. *Id*.  Plaintiffs signed their respective Conversion Agreements between April 5, 2004 and June 3, 2004. (Compl. ¶ 21).  NAD filed for bankruptcy with United States Bankruptcy Court for the District of Nevada on February 5, 2005. (Compl. ¶ 22).

Plaintiffs claim that the Conversion Agreements were executed as part of a fraudulent investment scheme devised by Defendants on behalf of NAD and its affiliated entities. (Compl. ¶ 7).  According to Plaintiffs, Romano, their "trusted financial advisor," induced them to convert their debt securities into equity with NAD knowing of the company's insolvent status and impending collapse. (Compl. ¶¶ 7, 18-21).  Plaintiffs claim that Romano: (1) omitted disclosures detailing the affiliation between NAD and Blue Vault Inc. (Compl. ¶ 9); (2) issued statements to the O'Briens for illusory corporate bonds and represented that they would yield a minimum of 12% per year (Compl. ¶¶ 12,13); (3) represented to the Jakemers that their Straight Note with NAD would increase in value approximately $16,000 in two years and be payable in one payment (Compl. ¶ 15); (4) failed to disclose relevant financial information, executive compensation, or contractual obligations during the course of soliciting Plaintiffs to convert their investments into NAD equity (Compl. ¶ 17); (5) failed to disclose Mr. Romano's pecuniary interest in the conversions or that the investments were unregistered securities (Compl. ¶¶ 18,19); (6) and represented to

1  Plaintiffs that they would come out "far better" by converting and could expect to double

2  their original investments (Compl. ¶ 20).

3       Defendants deny the existence of any fraudulent scheme and view Romano's

4  relationship with Plaintiffs as "ministerial." (Dkt. 7 at 8-9).  Defendants argue that this suit

5  is merely an effort by Plaintiffs to jump ahead of the other creditors in NAD's confirmed

6  bankruptcy plan and that Plaintiffs will eventually be paid in full pursuant to the bankruptcy

7  plan.

8  ii. Procedural History

9       Plaintiffs Complaint asserts claims for: (1) Fraud; (2) Breach of Fiduciary Duty; (3)

10  Violation of Arizona's Securities Act; (4)Violation of Nevada's Securities Act; (5) Civil

11  Racketeering; and , (6) Negligent Misrepresentation.  Originally filed in the Superior Court

12  of Arizona, Maricopa County, on June 26, 2006, this action was removed to this Court on

13  October 30, 2006 pursuant to 28 U.S.C. §§ 1441 and 1446.  On November 13, 2006,

14  Plaintiffs voluntarily dismissed the Civil Racketeering claim pursuant to Fed. R. Civ. P.

15  41(a). (Dkt. 13).

16       Defendants Romano and Turner filed the pending Request for Judicial Notice (Dkt.

17  6)  and Motion to Dismiss (Dkt. 7) on November 2, 2006, which were joined by Defendant

18  Carson on November 13, 2006. (Dkt. 10).  In turn, Plaintiffs filed responses to both the

19  request and the motion on November 13, 2006.  Defendants Romano and Turner filed their

20  Reply on November 20, 2006, which was subsequently joined by Defendant Carson.  The

21  matter is now fully briefed and ready for disposition by the Court.

22

23  **STANDARD OF REVIEW**

24       A complaint may be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil

25  Procedure only if "it appears beyond doubt that the plaintiff can prove no set of facts in

26  support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-

27  46 (1957); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  When

28  deciding a Motion to Dismiss, all allegations of material fact in the complaint are taken as

1   true and construed in the light most favorable to the plaintiff.  *W. Mining Council v. Watt*,

2   643 F.2d 618, 624 (9th Cir. 1981).

3        A court may dismiss a claim either because it lacks "a cognizable legal theory" or

4   because it fails to allege sufficient facts to support a cognizable legal claim.  *SmileCare*

5   *Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).

6   "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that

7   the complaint could not be saved by any amendment."  *Polich v. Burlington N., Inc.*, 942

8   F.2d 1467, 1472 (9th Cir.1991). When exercising its discretion to deny leave to amend, "a

9   court must be guided by the underlying purpose of Rule 15 to facilitate decisions on the

10  merits, rather than on the pleadings or technicalities."  *United States v. Webb*, 655 F.2d 977,

11  979 (9th Cir. 1981).

12                                      **DISCUSSION**

13  **A.  Scope of Judicial Notice**

14       As a preliminary matter, the Court will address the scope of the judicial notice taken

15  for purposes of resolving the instant motion to dismiss.

16       Defendants filed a Motion for Request for Judicial Notice (Dkt. 6) simultaneously

17  with their Motion to Dismiss and asked the Court to take judicial notice of the facts,

18  allegations, and arguments found in the court records of *In re North American Deed*

19  *Company, Inc.*, Case No. BK-S-95-10775-LBR, United States Bankruptcy Court, District of

20  Nevada (the "NAD Bankruptcy").  Plaintiffs do not oppose the Court taking judicial notice

21  of the terms of NAD's bankruptcy and related findings; however, Plaintiffs request that the

22  Court limit the scope of the judicial notice taken to exclude any allegations or arguments

23  contained in NAD bankruptcy litigation.

24       As a general rule, "a district court may not consider any material beyond the pleadings

25  in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.

26  2001).  There are, however, two exceptions to this general rule.  First, a court may consider

27  material properly submitted as part of the complaint on a motion to dismiss without

28  converting the motion to dismiss into a motion for summary judgment. *Id*.  Second, under

1    Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record."

2    *Mack v. South Bay Beer Distrib*., 798 F.2d 1279, 1282 (9th Cir. 1986).  "But a court may not

3    take judicial notice of a fact that is "subject to a reasonable dispute."  Fed. R. Evid. 201(b);

4    *Lee*, 250 F.3d at 689.

5          Here, the Court will take judicial notice of only the bankruptcy and related findings

6    in the NAD bankruptcy litigation.  The Court will not, however, take judicial notice of

7    disputed allegations or arguments in the NAD bankruptcy litigation because they are subject

8    to reasonable dispute and, therefore, not a judicially noticeable fact pursuant to Fed. R. Evid.

9    201.

10   **B. Defendants' Request to Stay Proceedings**

11         Turning to the motion to dismiss, Defendants accuse Plaintiffs of using this lawsuit

12   to "jump ahead" of the other creditors in NAD's confirmed bankruptcy plan.  According to

13   Defendants, this lawsuit will be mooted once Plaintiffs are paid in full pursuant to the

14   confirmed bankruptcy plan. (Dkt. 7 at 5).  Plaintiffs argue that the confirmed bankruptcy plan

15   defines "debtor" as NAD only and, pursuant to the express terms of the plan, they may pursue

16   claims against "persons other than the Debtor or Reorganized Debtor, including but not

17   limited to rescission of the original promissory note transactions..." (Dkt. 12 at 3-4).

18         While "the power to stay proceedings is incidental to the power inherent in every

19   court," the Court is not persuaded that the interests of judicial economy merit a stay in the

20   present action. *Landis v. North American Co.*, 299 U.S. 248, 255 (1936).  Pursuant to the

21   Order Confirming Debtor's Second Amended Chapter 11 Plan of Reorganization, Plaintiffs

22   have standing to pursue claims against persons other than the Debtor or Reorganized Debtor.

23   (Dkt. 6, Exhibit 2).  Plaintiffs contend that this provision was drafted in contemplation of

24   future litigation and, despite Defendants' claims, there is no evidence that Plaintiffs brought

25   this action with the intent to "double dip."  Rather, it appears that Plaintiffs are exercising

26   their right to pursue third party creditor claims.  Accordingly, after weighing the competing

27   interests, the Court declines to stay the proceedings.

28   **C. Plaintiffs' Fiduciary Relationship with Aaron Romano**

1    Defendants argue that the investments and stock conversions were "discreet events

2 wherein Mr. Romano served in a ministerial role" and that "fiduciary obligations do not arise

3 from [such] arms-length commercial transactions." (Dkt. 7 at 8-9).  The Court disagrees.

4    For a fiduciary relationship to exist there must be "peculiar reliance in the

5 trustworthiness of another." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 24,

6 945 P.2d 317, 335 (Ariz App. 1996) (quoting *Stewart v. Phoenix Nat'l Bank*, 49 Ariz. 34, 44,

7 64 P.2d 101, 106 1937)).  "A fiduciary relationship is a confidential relationship whose

8 attributes include 'great intimacy, disclosure of secrets, [or] intrusting of power.'" *Standard*

9 *Chartered PLC,* 190 Ariz. at 24, 945 P.2d at 335 (quoting *Rhoads v. Harvey Pubs., Inc.*, 145

10 Ariz. 142, 149, 700 P.2d 840, 847 (App. 1984)).  Whether a fiduciary duty exists is generally

11 a question of fact; however, the trial court must decide the issue when the evidence is

12 insufficient to support a verdict.  *Rhoads*, 145 Ariz. at 148, 700 P.2d at 846.

13    Plaintiffs' claim that Romano was their "trusted financial advisor."  Of course, this

14 claim by itself does not establish the existence of such a relationship.  However, the ongoing

15 series of investments made by the Plaintiffs, which generally increased over time (Compl.

16 ¶¶ 12, 15 & 21), and Plaintiffs' willingness to convert their debt securities into equity

17 securities, which were allegedly "solicited by Romano and signed by Carson" (Compl. ¶ 17),

18 bolster Plaintiffs' claim.  Moreover, Romano & Carson, Inc. referred to itself as "Registered

19 Investment Advisors" in the December 31, 2001, statement they sent to the O'Briens. (Dkt.

20 1, Attachment 8 at 8). Finally, a Blue Vault statement sent to the O'Briens on June 2, 2000

21 by Mr. Romano bears a handwritten note that reads, "Gordon, Acct will yield a minimum of

22 12% interest. You will receive Qtrly statements!" (*Id*. at 10).  Clearly, when viewed in a light

23 most favorable to Plaintiffs, this does not appear to be a ministerial relationship consisting

24 of a few discreet transactions.  Accordingly, for the purposes of resolving the instant motion.

25

26

27

28

1    the Court finds that Plaintiffs have alleged facts sufficient to establish that a fiduciary

2    relationship existed between Romano and Plaintiffs.[2]

3    **D. Fraud**

4         To establish a claim for fraud, Plaintiffs must show a concurrence of nine elements:

5    (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its

6    falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and

7    in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his

8    reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury.

9    *Staheli v. Kauffman*, 122 Ariz. 380, 383, 595 P.2d 172, 175 (1979).  Defendants move to

10   dismiss the fraud claim on three grounds: (i) Plaintiffs failed to plead fraud with particularity

11   pursuant to Rule 9(b) of the Fed. R. Civ. P.; (ii) the representations pled by Plaintiffs cannot

12   support a fraud claim; and (iii) Plaintiffs failed to plead any material fraudulent omissions.

13        i. Rule 9(b)'s Particularity Requirement

14        Rule 9(b) of the Federal Rules of Civil Procedure requires that claims of fraud be pled

15   with particularity.  Defendants argue that "Plaintiffs' claim for fraud is remarkable in that it

16   fails to allege a single false statement by any of the Romano Defendants." (Dkt. 7 at 5).  The

17   Court disagrees.

18        The Court finds that Plaintiffs have pled their claim for fraud with sufficient

19   particularity.  Plaintiffs allege that Defendants did not disclose or describe any kind of

20   affiliation between NAD and Defendants' other business entities, such as Blue Vault, Inc. and

21   Romano & Carson Inc., even though the debt securities Plaintiffs had purchased in these and

22   other such entities were being converted to NAD's benefit by Defendants.  (Compl. ¶ 9).

23   Additionally, Plaintiffs allege that Defendants falsely represented to the O'Briens that their

24   money was being invested into corporate bonds would yield a minimum of 12% per year

25   _____

26        [2]Without citing any legal authority, Defendants claim that no allegations are made against
     Turner with regard to Plaintiffs' claim for breach of fiduciary duty.  However, Plaintiffs' Complaint
27   expressly states that "Defendants are liable...for the actions of Romano." (¶ 33).  Therefore, because
     Defendants claim is incorrect and lacking legal support, the Court will not dismiss this claim as to
28   Turner.

1    (Compl. ¶ 13) and intentionally withheld material facts relating to NAD's financial condition

2    while inducing Plaintiffs to convert their debt securities into equity issued by the insolvent

3    NAD (Compl. ¶¶ 17-19).  In light of the allegedly false representations listed above, the

4    Court finds that Plaintiffs satisfy Rule 9(b)'s particularity requirement.

5              ii. The Representations Pled by Plaintiffs

6              Defendants argue that only two representations were pled by Plaintiffs and that neither

7    of these claims can support a claim for fraud.  The alleged representations regarding the

8    benefits of converting loans to equity were, according to Defendants, opinions about future

9    outcomes expressed by Romano to reflect his "optimism that Plaintiffs would be better off

10   under the conversion agreement and would double their money." (Dkt. 7 at 6-7).

11             Plaintiffs contend that they alleged numerous representations made by Defendants in

12   their Complaint, such as that Romano led the O'Briens to believe that their investments were

13   in the form of corporate bonds in Blue Vault, Inc. and that this account would yield a

14   minimum of 12% interest. (Dkt. 12 at 5).  In addition, Plaintiffs claim that Romano "similarly

15   solicited funds from the Jakemers for investment into a 'Straight Note' issued by NAD" and

16   later indicated that they "would come out far better than they would have come out by simply

17   getting paid back their original investment principal with interest" and "could expect to

18   double their money" if they converted their debt securities into equity securities.

19             Generally, a representation of value is regarded as a statement of opinion, which is not

20   actionable as fraud. *Page Investment Co. v. Staley*, 105 Ariz. 562, 564, 468 P.2d 589 (1970).

21   However, "if the person making the statement of value stands in a fiduciary relationship to

22   the hearer, the misrepresentation may be actionable." *Id*.  Here, the Court finds that Plaintiffs

23   have provided representations sufficient to support their fraud claim.  Plaintiffs hired and

24   relied on Romano as a financial advisor.  Because of Romano's fiduciary status, his

25   representations regarding the value of the O'Brien's investments in the corporate bonds and

26   the Jakemer's investment into the straight note are actionable as fraud.  Moreover, the Court

27   finds that Romano's alleged statements were definite statements as opposed to mere opinions

28   or promises about future values due to the specificity of the statements.  Romano represented

1    that Plaintiffs' investments were in corporate bonds with Blue Vault, Inc. or a straight note

2    with NAD and represented specific return rates for these investments: 12 % in the case of

3    corporate bonds and $16,377.05[3]. (Compl. ¶¶ 12-15).  Accordingly, the Court finds that these

4    representations were not "prognostications of future outcomes" and were sufficient to support

5    a claim for fraud.[4]

6            iii. <u>Pleading Fraudulent Omissions</u>

7            Arizona requires fraudulent concealment to be pled separately from fraud unless there

8    is a concealment of facts which a party is under a legal or equitable obligation to

9    communicate. *Schock v. Jacka*, 105 Ariz. 131, 133, 460 P.2d 185, 187 (1969).  Defendants

10   argue that they were not obligated to inform Plaintiffs of any of the events relating to the

11   management of NAD or Blue Vault described in the Complaint; therefore, any claim for

12   fraudulent omission  and/or concealment had to be pled separately. (Dkt. 7 at 7-8).

13           Defendants correctly assert that Plaintiffs' Complaint does not include a separate claim

14   for fraudulent concealment.  However, in light of the earlier Court's finding that a fiduciary

15   relationship may exist between Plaintiffs and Defendant Romano, *supra* section D(ii),  the

16   exception to the general rule requiring fraudulent concealment to be pled separately from

17   fraud applies to this action.  Romano, as a fiduciary with both legal and equitable duties to

18   Plaintiffs, was obligated to provide Plaintiffs with certain, relevant information, which

19   Plaintiffs allege was omitted in their Complaint.  For example, information describing the

20   affiliation between NAD and related entities, such as Romano & Carson Inc. and Blue Vault,

21   Inc. (Compl. ¶ 9); information relating to NAD's financial condition (Compl. ¶ 10, 17); and,

22

23           [3]This figure represents the difference between the Jakemers' original investment in the
24   straight note ($64,375) and the alleged return to be paid on the note on July 22, 2004 (80,752.05).
     (Compl. ¶ 15).

25           [4]Without citing any legal authority, Defendants state that no statements or admissions are
26   attributed to Turner and, therefore, he is entitled to dismissal of the fraud claim entirely.  While
     Plaintiffs did not attribute any statements to Turner, they did allege that he is jointly and severally
27   liable for the fraudulent acts by virtue of his acting "in concert" with Romano and Carson to defraud
     Plaintiffs. (Compl. ¶ 31).  Accordingly, because Defendants' claim lacks legal support, the Court will
28   not dismiss the fraud claim as to Turner.

information regarding the risks surrounding Plaintiffs' conversion transactions (Compl. ¶ 18-20) should have been communicated to Plaintiffs given their fiduciary relationship with Romano. Thus, the Court finds that Plaintiffs were not required to plead fraudulent concealment separately and will deny Defendants' motion to dismiss the fraud claim.

**E. Arizona Securities Act Claims**

Plaintiffs' Third Claim for Relief alleges violations of the Arizona Securities Act. Specifically, Plaintiffs allege that Romano violated A.R.S. §§ 44-1991(A)(2) and 44-1841 and that Carson and Turner are similarly liable as principals and/or officers of NAD under A.R.S. § 44-1999.

Defendants challenge Plaintiffs' claims on two grounds. First, Defendants argue that the claims brought pursuant to A.R.S. § 44-1841 are time barred pursuant A.R.S. § 44-2004(A), which provides a one year statute of limitations for claims brought pursuant to § 44-1841. Plaintiffs respond by arguing that the reference to the unregistered securities was made only to support their claim for violations of A.R.S. §§ 44-1991. (Dkt. 19 at 16).

Based on the claim alleged in the Complaint, it is unclear whether Plaintiffs' reference to the unregistered securities was alleged as a separate claim or offered merely to support their claims for violations of A.R.S. §§ 44-1991. Plaintiffs' Complaint provides:

> Defendant Romano offered or sold securities by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading within the meaning of A.R.S. § 44-1991. Said securities were further unregistered and sold in further violation of A.R.S. § 44-1841.

Compl. ¶34. The Court finds the last sentence, "[s]aid securities were further unregistered....," is particularly vague. However, Plaintiffs stated that they have not made any claims pursuant to A.R.S. § 44-1841; rather, their claims arise from violations of A.R.S. § 44-1991. Therefore, the Court finds that the issue is moot.

Defendants' second challenge to Plaintiffs' Arizona Securities Act claims is that "[t]he Complaint fails to plead any material, untrue or misleading statements of fact in connection with Plaintiffs' transactions with [D]efendants." (Dkt. 7 at 10).

1    Arizona provides a claim for securities fraud when a person, in connection with a sale

2    of securities, makes "any untrue statement of material fact, or omit[s] to state any material

3    fact necessary in order to make the statements made, in light of the circumstances under

4    which they were made, not misleading." A.R.S. § 44-1991(A)(2).  In Arizona, materiality

5    requires a showing that there was a substantial likelihood, under the circumstances, that the

6    misstated fact or omission would have assumed actual significance in the deliberations of a

7    reasonable buyer. *Trimble v. American Sav. Life Ins. Co.*, 152 Ariz. 548, 553, 733 P.2d.

8    1131, 1136 (Ariz. App. 1986).

9    The Court finds that Plaintiffs pled numerous material misrepresentations and

10   omissions in their Complaint and that these pleadings are sufficient to support a claim for

11   fraud under Arizona's Securities Act.  Plaintiffs alleged that Defendants: (1) omitted

12   disclosures detailing the affiliation between NAD and Blue Vault Inc. (Compl. ¶ 9); (2)

13   issued statements to the O'Briens for illusory corporate bonds and represented that they

14   would yield a minimum of 12% per year (Compl. ¶¶ 12,13); (3) represented to the Jakemers

15   that their Straight Note with NAD would increase in value approximately $16,000 in two

16   years and be payable in one payment (Compl. ¶ 15); (4) failed to disclose relevant financial

17   information, executive compensation, or contractual obligations during the course of

18   soliciting Plaintiffs to convert their investments into NAD equity (Compl. ¶ 17); (5) failed

19   to disclose Mr. Romano's pecuniary interest in the conversions or that the investments were

20   unregistered securities (Compl. ¶¶ 18,19); (6) and represented to Plaintiffs that they would

21   come out "far better" by converting and could expect to double their original investments

22   (Compl. ¶ 20).  These misrepresentations and omissions were material as they related directly

23   to the attractiveness of the investments.  For example, the representations concerning the

24   value of the investments and their expected performance would certainly impact the

25   deliberations of a reasonable buyer.  Moreover, the financial health of NAD, Mr. Romano's

26   pecuniary interest in the conversions, and the consequences of converting their investments

27   into NAD equity, would all be significant in the deliberations of a reasonable buyer.  Thus,

28

1    the Court finds that Plaintiffs' securities fraud claim was well supported and will deny

2    Defendants' motion to dismiss this claim.

3    **F. Nevada Securities Act**

4         Plaintiffs' Fourth Claim for Relief alleges violations of Nevada's Securities Act.

5    Plaintiffs claim that Defendants sold unregistered securities in violation of N.R.S. § 90.460

6    and that these sales were made to Plaintiffs in violation of N.R.S. § 90.570. Plaintiffs further

7    allege that "Defendants are all control persons of Romano and NAD within the meaning of

8    § 44-1999 and are accordingly jointly and severally liable for Romano's violations of N.R.S.

9    §§ 90.460 and 90.570 pursuant to N.R.S. § 90.660(4)."

10        Defendants argue that Plaintiffs' claims under the Nevada Securities Act should be

11   dismissed because: (1) no "piercing the veil" claim has been pled as required under Nevada

12   law; (2) the conversions were exempt from registration under Nevada law and therefore not

13   actionable; and, (3) no actionable misrepresentations were pled.

14        The Court reject Defendants' third argument because, as discussed *supra* sections D(ii)

15   and E, Plaintiffs have pled the requisite material representations and omissions. Turning to

16   Defendants' first argument- that Plaintiffs' failed to plead a "piercing the veil" claim under

17   Nevada law– the Court finds that Defendants overlooked a key provision of the controlling

18   statute. Defendants argue that Plaintiffs' attempt to hold them liable as individuals is

19   improper pursuant to N.R.S. § 78.138(7). However, N.R.S. § 78.138(7) states, in relevant

20   part, "Except as otherwise provided in NRS ... 90.660..." According to the Complaint,

21   Plaintiffs alleged liability pursuant to N.R.S. § 90.660(4).[5] Under N.R.S. § 90.660(4):

22        A person who directly or indirectly controls another person who is liable under [§§
           90.660(1) or 90.660(3)], a partner, officer or director of the person liable, a person
23

24        [5]Plaintiffs erroneously cited A.R.S. § 44-1999 in their claim for relief pursuant to the Nevada
25   Securities Act. (Compl. ¶ 40). Here, it appears Plaintiffs mistakenly incorporated the joint and
     several liability provision of the preceding claim brought pursuant to Arizona's Securities Act.
26   Regardless, the error was corrected later in the same sentence when Plaintiffs properly referred to
     the correct provision of the Nevada Securities Act, N.R.S. § 90.660. Accordingly, the Court finds
27   that the pleading provided Defendants with proper notice of the claim and will not construe the
28   pleading hypertechnically. *See* Fed. R. Civ. P. 8(f).

occupying a similar status or performing similar functions, any agent of the person liable, an employee of the person liable if the employee materially aids in the act, omission or transaction, an employee of the person liable if the employee materially aids in the act, omission or transaction constituting the violation, are also liable jointly and severally with an to the same extent as the other person....

Defendants admit that Romano and Turner are officers of NAD and that Romano was a principal in Romano & Carson, Inc. (Dkt. 7 at 2). Therefore, the Court finds that Defendants fall within the scope of individuals covered by N.R.S. § 90.660(4), which is an exception to N.R.S. § 78.138(7).

Defendants second challenge to the Nevada Securities Act claims is that the "loans and equity conversion made by Plaintiffs were exempt from registration under N.R.S. § 90.460 and therefore not actionable by operation of N.R.S § 90.530(11), which creates an exemption for securities commonly called 'private placements'" (Dkt. 7 at 12). Plaintiffs argue that the NAD conversion does not meet the registration requirements under the Securities Act of 1933 §3(a)(9), and that Defendants have the burden of claiming the exemption, which they have not met. (Dkt. 19 at 16-17).

Nevada law exempts transactions from N.R.S. § 90.460 if: (1) the transaction is part of an issue in which there are no more than 25 purchasers in the state during any 12 consecutive months; (2) no general solicitation or general advertising is used in connection with the offer or sale of the securities; (3) no commission or similar compensation is paid, directly or indirectly, to a person other than a broker-dealer licensed or not required to be licensed, for soliciting a prospective purchaser; and, (4) the seller reasonably believes that all the purchasers are purchasing for investment. *See* N.R.S. § 90.530(11). Here, the Court finds that Defendants have not met their burden of claiming the exemption. Specifically, Defendants failed to show that no similar compensation was paid, directly or indirectly, to Romano for soliciting the Conversion Agreements. The facts alleged in the Complaint, when viewed in the light most favorable to Plaintiffs, show that Romano received indirect compensation for soliciting the Conversion Agreements. While the facts do not show that Romano received a commission for soliciting the Conversion Agreements, he allegedly borrowed a personal loan from NAD in the amount of $357,536.96 and was permitted to

- 13 -

1   repay with shares of stock in another entity he managed, TitleRight. (*Id.* ¶¶ 9, 23).
2   Furthermore, in light of NAD's insolvent status at the time Romano solicited the Conversion
3   Agreements and Romano's status as a manager/controller of NAD, the Court finds that it is
4   unlikely that he received indirect compensation for soliciting the investments in NAD stock.
5   Therefore, the Court finds that Defendants have not demonstrated that the transactions at
6   issue were exempt from registration under N.R.S. § 90.460 and will deny Defendants' Motion
7   to Dismiss as to the claims brought under Nevada's Securities Act.

8   **G. Negligent Misrepresentation**

9        Defendants challenge Plaintiffs' negligent misrepresentation claim on the same
10  grounds that they challenged Plaintiffs' fraud claim, arguing that a claim may not be premised
11  on alleged representations that are statements of personal opinion or promises of future
12  conduct. (Dkt. 7 at 16).  As discussed *supra* sections D(ii) and E, the Court finds that
13  Plaintiffs have pled the requisite material representations and omissions to sustain a claim
14  for fraud or negligent misrepresentation.  Thus, the Court will deny Defendants' Motion to
15  Dismiss as to Plaintiffs' claim for negligent misrepresentation.

16                                **CONCLUSION**

17        Although the Court has resolved the issues raised in Defendants' Motion ti Dismiss,
18  most of the issues raised are more properly addressed in a motion for summary judgment.
19  Nonetheless, for the reasons set forth above,

20        **IT IS HEREBY ORDERED** that Defendants' Request of Judicial Notice (Dkt. 6) is
21  **GRANTED IN PART**.  In resolving the instant Motion to Dismiss, the Court took judicial
22  notice of only the bankruptcy and related findings in the NAD bankruptcy litigation.  The
23  Court did not consider any disputed allegations or arguments raised in the NAD bankruptcy
24  litigation.

25        **IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (Dkt. 7) is
26  **DENIED**.

27  DATED this 5th day of March, 2007.

                              Stephen M. McNamee
                              United States District Judge

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28